**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **Gulf Haulage Heavy Lift Co.,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:18-cv-04392** |
| | § | |
| **Swanberg International, Ltd.,** | § | |
| | § | |
| **Respondent.** | § | |

**PETITIONER GULF HAULAGE HEAVY LIFT CO.'S MOTION FOR ORDER
CONFIRMING ARBITRAL AWARD AND FOR JUDGMENT**

This is a summary proceeding to confirm a foreign arbitral award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"). *See* 9 U.S.C. § 201 *et seq.* Petitioner Gulf Haulage Heavy Lift Co. ("GHHL") hereby moves for an order confirming the arbitral award rendered in the Kingdom of Saudi Arabia in an arbitration between it and Respondent Swanberg International, Ltd. ("Swanberg"). Since the requested order will conclude this summary proceeding, GHHL additionally requests judgment thereon.

As a preface to this Motion, GHHL registers its extreme disappointment with Swanberg's evasive tactics to delay compliance with an award that, notably, was rendered in an arbitration that Swanberg itself had initiated. By the time of the arbitration, GHHL's effort to form a jointly-owned business venture with Swanberg had come to a dead end, and both parties requested termination of their commercial agreements. The arbitrators resolved the dispute accordingly, crafting an even-handed award that aimed to return both parties to their respective pre-contractual positions: GHHL was ordered to return certain heavy transportation equipment that it had agreed to purchase from Swanberg to capitalize the joint business venture; in turn,

Swanberg was ordered to pay back the money that GHHL had given toward the capitalization of the joint business venture, in addition to incidental amounts that GHHL had expended to repair or maintain the equipment. Neither party was awarded all that it asked for.

GHHL has dutifully complied with its obligations under the award, having repeatedly asked Swanberg to take delivery of the equipment. Conversely, Swanberg has ignored or declined these invitations. Worse, Swanberg has given only dubious excuses for not returning GHHL's money as ordered in the award. Swanberg's refusals to comply have persisted even after a failed appeal of the award in the Saudi courts which, again, Swanberg itself initiated.

The time has come for Swanberg to comply with its obligations in the award. In the Petition to Confirm Arbitral Award and accompanying Declaration (ECF 1 & 2), GHHL proved all of the facts necessary to order confirmation. Indeed, Swanberg has admitted these same facts in its Answer to the Petition (ECF 7). At the same time, Swanberg has failed to prove any of the grounds specified in the Convention that might permit refusing confirmation of the award. Accordingly, in accordance with Chapter 2 of the Federal Arbitration Act, "[t]he court shall confirm the award[.]" 9 U.S.C. § 207.

## I.     BACKGROUND

### A.     In 2013, GHHL Enters Into A Business Relationship with Swanberg with the Intention of Forming a New Jointly-Owned Enterprise

GHHL is a Saudi-based company and market leader in the heavy transportation and lifting industry in Saudi Arabia and greater Middle East. Petition (ECF 1), ¶ 10. Swanberg is a Houston-based company in a similar line of business with operations around the world. *Id.*

In June 2013, GHHL and Swanberg negotiated the formation of a new Saudi corporation through which they would "jointly pursue new business." *See* MOU (ECF 1-2), at 1. Their negotiations culminated in Swanberg sending to GHHL a memorandum of understanding letter

dated June 24, 2013 ("MOU"). *Id.* In the MOU, Swanberg proposed that GHHL "acquire 80% of the Swanberg Saudi Arabia assets from [Swanberg] and contribute them to a new Saudi Corporation," while Swanberg would "contribute the remaining 20% of the Swanberg Saudi Arabia assets" to the new corporation. *Id.* In proportion to these contributions, GHHL would own 80% of the new company's shares while Swanberg would own the remaining 20%. *Id.*

To effectuate these transactions, the MOU noted that two agreements would be required: An Asset Purchase Agreement, by which Swanberg would sell to GHHL an 80% interest in the equipment to be contributed to the new corporation, and a Shareholders Agreement to govern the new corporation itself. *Id.* Swanberg stated it would "immediately begin drafting" the documentation. *Id.* at 2.

Until these transactions were consummated, Swanberg additionally "propose[d] that the assets can be utilized on a contract basis by a joint venture owned 80% by GHHL and 20% by [Swanberg.]" *Id.* at 1. As stated in the MOU, "[t]his contractual agreement would last until the new corporation is able to begin operations." *Id.* GHHL signed the MOU. *Id.* at 2.

As contemplated in the MOU, Swanberg drafted and provided to GHHL the Asset Purchase Agreement and Shareholders Agreement. ECF 1-4 (Asset Purchase Agreement); ECF 1-3 (Shareholders Agreement). GHHL and Swanberg ultimately executed both agreements which, consistent with the date of the MOU, were dated June 24, 2013. *Id.*

The Asset Purchase Agreement provided that GHHL would purchase an "undivided 80% interest in all of [Swanberg's] right, title and interest" in certain heavy transportation equipment in exchange for $6.8 million. ECF 1-4, at 2(¶¶ 2-3). This purchase price implied that the total value of the equipment was $8.5 million (80% x $8.5 million = $6.8 million). Consistent with the MOU's intention of forming a new corporation, Swanberg also promised to "assist [GHHL]

with all paperwork and administrative procedures necessary and incident to the registration of the equipment in a new company being formed in Saudi Arabia to be owned 80% of [GHHL] and 20% by [Swanberg.]" *Id.* at 2 (¶ 7).

The Shareholders Agreement, in turn, provided that GHHL and Swanberg would form, own and manage a new corporation registered under the laws of Saudi Arabia that would "engage in the erecting, dismantling and mobilization of drilling rigs for [the] oil and gas drilling industry in the Kingdom of Saudi Arabia[.]" ECF 1-3, at 5 (§ 2.02). Swanberg specifically promised it would use its "reasonable efforts to cause the [new] Company to be formed and registered to do business in the Kingdom of Saudi Arabia[.]" *Id.* at 6 (§ 2.05). Until the new company's formation, Swanberg and GHHL agreed that they would "commence doing business as a joint venture . . . and the Parties shall operate the Assets and business of the company as a joint venture on the same terms" set forth in the Shareholders Agreement. *Id.*

In the event of a dispute between the parties, the Shareholders Agreement contained an arbitration agreement at Article 17. Section 17.02 provided as follows:

> 17.02 Upon delivery of an Arbitration Notice, the matter shall be referred to arbitration in accordance with the laws of the Kingdom of Saudi Arabia (Saudi Arbitration Regulations) and the arbitration to be held in (Dammam). The arbitrator shall be appointed in accordance with the Saudi Arbitration Regulations; provided that such arbitrator shall be qualified in accordance with the provisions of Article 3 of the Arbitration Act of the Kingdom of Saudi Arabia. The language of all arbitrations shall be the English language. Any decision of the arbitrator shall be final, conclusive and binding on the Shareholders, and the Shareholders hereby expressly agree that the arbitrator shall be empowered to direct a Shareholder to pay all the costs of such proceedings (including the fees of the arbitrator and of any independent experts and advisors instructed by the arbitrator in connection with the arbitration).

The Asset Purchase Agreement incorporated by reference the above provision, providing that "[a]ll disputes arising out of this Agreement shall be settled by arbitration in accordance with Article 17 of the Shareholder Agreement[.]" ECF 1-4, at 3 (¶ 9).

**B.     GHHL Pays Swanberg For the Equipment to be Contributed to the New Jointly-Owned Enterprise, But Swanberg Prevents Its Legal Registration**

Between August and October 2013, GHHL made three separate payments totaling $5,330,000 toward the $6.8 million purchase price of the equipment.  Award (ECF 1-8), at 11.  Unfortunately, after Swanberg finally delivered the equipment, GHHL discovered it was "in a damaged and unfit condition."  *Id.* at 4.  Due to the poor condition of the equipment, GHHL incurred costs to make repairs and maintenance on much of the equipment.  *Id.*  In hindsight, it appeared to GHHL that Swanberg had sold the equipment at "an unfair price that far exceed[ed] the market price on the date of the sale[.]"  *Id.*

While disappointed in the condition of the equipment, GHHL accepted it at the time "on the basis that [Swanberg] w[ould] be [its] partner in the new company[.]"  *Id.*  GHHL therefore prepared the legal requirements to establish the new jointly-owned company.  *Id.*  Yet, in violation of its contractual promises, Swanberg did not cooperate:  "When [GHHL] requested [Swanberg] to complete the documents and make a power of attorney to complete the procedures of the company's registration . . . , [Swanberg] did not reply nor pay any attention and postponed and evaded to do so."  *Id.*

Despite its blatant refusal to form the new company as it had agreed, Swanberg insisted that GHHL pay $1,470,000 as the remaining balance of the $6.8 million contractual purchase price for the equipment.  Arbitration Agreement (ECF 1-6), at 5.  Even more gallingly, Swanberg demanded that GHHL pay an *additional* $1.7 million to buy out Swanberg's remaining 20% interest in the equipment since the "legal registration procedures . . . were not completed."  *Id.* at 6.  In effect, Swanberg sought to offload its aged equipment onto GHHL in exchange for the full (and inflated) $8.5 million value that it had arbitrarily assigned to the equipment, while also walking away from its contractual promises to form a new business venture with GHHL.

GHHL did not acquiesce to Swanberg's exorbitant demands. Therefore, Swanberg commenced arbitration in an effort to force GHHL to comply.

### C. The Parties Arbitrate Their Dispute in Saudi Arabia in Accordance with Their Arbitration Agreement, and an Award Is Rendered

Each of the parties obtained Saudi counsel of its choosing for the arbitration. *See* Petition (ECF 1), at 8 ¶ 19; Answer (ECF 7), at 4-5 ¶ 19. Through their respective counsel, the parties negotiated and executed an Arbitration Agreement providing the terms on which they agreed to refer their dispute to arbitration. *See id.*

The Arbitration Agreement expressly acknowledges the arbitration clauses contained in "Article (9) of the Assets Purchase Agreement and Article (17) of the Partnership [Shareholders] Agreement." Arbitration Agreement (ECF 1-6), at 3. It further provided that "the terms and conditions of the aforementioned agreement[s] hold valid and enforceable ***unless this agreement stipulates otherwise, whereupon the parties hereto agree to determine the arbitration provisions as detailed" in the Arbitration Agreement***. *Id.* (emphasis added). Among other provisions, the Arbitration Agreement provided for the application of Saudi law, Arabic as the language of the proceeding, and a three-arbitrator Panel. *Id.* at 4-5. The agreed place of arbitration was Dammam, Saudi Arabia. *Id.* at 7.

Over the course of the arbitration, Swanberg and GHHL each submitted multiple rounds of pleadings. Petition (ECF 1), at 8 ¶ 20; Answer (ECF 7), at 5 ¶ 20. For its part, Swanberg requested $3,170,000 in compensation, which compromised the "outstanding sum" under the Asset Purchases Agreement plus 20% of the equipment's nominal value to buy out Swanberg's share. Award (ECF 1-8), at 5. Swanberg additionally demanded one million Saudi riyals "as compensation for the default to pay and loss of anticipated profits," plus attorney's fees and costs of the arbitration. *Id.*

Conversely, given the "gross unfairness in the sale price of equipment," GHHL requested that Swanberg be ordered to pay the difference between the amount that GHHL had paid for the equipment and 80% of its actual value based on an independent appraisal. *Id.* at 6. GHHL also sought the costs of repair and maintenance of the equipment, an additional $5 million "as compensation for the serious damage suffered by [GHHL] due to entering into contracts with other companies in the name of the joint venture," and attorney's fees and costs. *Id.* at 7.

Despite their differences about who owed money to whom, both parties coincided in asking the Panel to terminate the commercial agreements that were the basis of their business relationship. *See id.* at 5 (Swanberg asking for the Shareholders Agreement to be terminated), at 6 (GHHL asking for the Asset Purchase Agreement to be terminated).

After receiving the parties' pleadings, the Tribunal commissioned a technical expert to evaluate the equipment. *Id.* at 15. This expert submitted a report in which he concluded that the value of maintenance and repair was 778,251 Saudi riyals. *Id.* "[N]either Party challenged said conclusion drawn by the Expert[.]" *Id.* at 16.

In its final award rendered on April 12, 2017 ("Award"), the Tribunal found that the "Parties [have] agreed to discontinue with the partnership[.]" *Id.* at 15. Given "the termination of partnership," the Tribunal decided "to reinstate the Parties to the condition prior to contracting[.]" *Id.* The Tribunal accordingly ordered that (1) the parties' commercial agreements be "terminated," (2) GHHL deliver the equipment to Swanberg "in the condition specified in the Expert's report," (3) Swanberg pay back to GHHL the $5,330,000 it had received for "the value of the equipment," and (4) Swanberg pay to GHHL 778,251 Saudi riyals for "the maintenance value of the equipment." In addition, the Tribunal (5) denied all other relief requested by the parties, including requests for attorney's fees and costs since "neither Party had

all of its requests granted, [and] neither of them lost all its requests." *Id.* at 16-17.

###### D. Swanberg Refuses Multiple Demands to Pay the Amounts Due Under the Award, Including After a Failed Appeal

On May 10, 2017, soon after the Award was rendered, GHHL requested in writing that Swanberg comply with the Award. Exh. 1, Email Thread between Swanberg and GHHL. GHHL specifically asked that Swanberg "arrange for taking the possession back of the Equipment as listed in the above referred Law Suit and also thereby to make the [ordered] payments to [GHHL.]" *Id.* at 1. Swanberg did not respond to this request. On November 19, 2017, GHHL renewed its request that Swanberg comply. *Id.* Again, Swanberg did not respond.

Instead, in November 2017, Swanberg filed an appeal in the Saudi courts to set aside the Award as being contrary to Saudi law. *See* Petition (ECF 1), at 10 ¶ 24; Answer (ECF 7), at 6 ¶ 24. GHHL opposed Swanberg's appeal and requested that the Award be enforced. *Id.* In a final judgment dated February 18, 2018 ("Judgment"), the Saudi Court found that the Award was not contrary to Saudi law, and it ordered that the Award be enforced. *See* Judgment (ECF 1-10).

Even after its failed attempt to set aside the Award, Swanberg took no steps to comply with its obligations under the Award. Accordingly, in September 2018, GHHL sent a letter demanding that Swanberg make the required payments. Exh. 2, Ltr. From D. Nichols (GHHL) to C. Newcomb (Swanberg), 9/20/2018. On October 9, 2018, Swanberg responded it would be "premature" to satisfy the Award because its "Saudi counsel have initiated legal proceedings in Saudi to address open aspects or issues relating" to the Award. Exh. 3, Email Thread between Swanberg and GHHL, at 1. But, on information and belief, Swanberg had not in fact initiated legal proceedings. It gave no other reason for withholding payment on the Award.

Having failed to elicit Swanberg's voluntary compliance with the Award, GHHL was forced to file the present action under the New York Convention.

## II.     CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

The New York Convention governs "'the recognition and enforcement of arbitral awards made in the territory of a [country] other than the [country] where the recognition and enforcement of such awards are sought.'" *Gulf Petro Trading Co., Inc. v. Nigerian Nat. Petroleum Corp.*, 512 F.3d 742, 746 (5th Cir. 2008) (quoting Convention, art. I(1)). One purpose of the Convention is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts[.]" *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n. 15 (1974). Therefore, the Convention, by design, "significantly limits the review of arbitral awards in courts of a secondary jurisdiction," that is, the courts where recognition and enforcement are sought. *Gulf Petro*, 512 F.3d at 746.

Article V of the Convention "enumerates the exclusive grounds on which a court of secondary jurisdiction may refuse recognition and enforcement of an award." *Id.* at 747. "[C]ourts in countries of secondary jurisdiction may refuse enforcement only on the grounds specified in Article V." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara* (*Kahara Bodas II*), 364 F.3d 274, 288 (5th Cir. 2004); *see also* 9 U.S.C. § 207. Being limited to the grounds specified in the Convention, a "district court's review of an award is extraordinarily narrow." *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015 (5th Cir. 2015) (internal quotation marks and citation omitted). Moreover, all "[d]efenses to enforcement under the New York Convention are construed narrowly[.]" *Kahara Bodas II*, 364 F.3d at 288.

"The party opposing enforcement of the award on one of the grounds specified in the Convention has the burden of proof." *Asignacion*, 783 F.3d at 1015-16; *see also* Convention, art. V(1) (party opposing enforcement must furnish "proof"). Moreover, even if the party opposing

enforcement managed to prove any of the specified grounds, it would mean only that "the court *may* refuse enforcement," not that it must do so. *Kahara Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir. 2003) (*Kahara Bodas I*) (emphasis in original, citing Convention, art. V).

### III.  ARGUMENT AND AUTHORITIES

#### A.  GHHL Is Entitled to an Order Confirming the Award

In this proceeding, GHHL's sole burden is to prove that it is a party to "an arbitral award falling under the Convention[.]" *See* 9 U.S.C. § 207.  It has met this burden.

The Convention applies in this action because the Award "has been made in one signatory state," *i.e.*, in the Kingdom of Saudi Arabia, and "recognition or enforcement is sought in another signatory state," *i.e.*, in the United States. *Asignacion*, 783 F.3d at 1015; *see also Nw. Airlines, Inc. v. R&S Co. S.A.*, 176 F. Supp. 2d 935, 938 (D. Minn. 2001) (confirming signatory countries).[1]  Swanberg has admitted these facts and, thus, has effectively admitted that the Convention applies to this action. *See* Answer (ECF 7), at 7 ¶¶ 30-31.

In addition, "[a]n award's enforcement is governed by the Convention, as implemented at 9 U.S.C. § 201 *et seq.*, if the award arises out of a commercial dispute and at least one party is not a United States citizen." *Asignacion*, 783 F.3d at 1015 (citing 9 U.S.C. § 202).  These conditions are met here.  As shown above in the Background section of this Motion, the Award arises out of a commercial dispute.  Moreover, neither party in this proceeding is a citizen of the United States. *See* Petition (ECF 1), at 2 ¶¶ 1-2.  Again, Swanberg has admitted these facts. *See* Answer (ECF 7), at 1, 7 ¶¶ 1-2, ¶ 30

---

[1] *See also* United Nations Commission on International Trade Law, Status Table for Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *available at* http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html.

Because the Award falls under the Convention, this Court "shall confirm the award" unless Swanberg has proved a ground specified in the Convention for refusing confirmation. 9 U.S.C. § 207. But as shown below, Swanberg has not proved any such ground.

**B.      Swanberg Has Failed to Prove Any of the Grounds Specified in the New York Convention for Refusing Confirmation of the Award**[2]

Each of the purported defenses in Swanberg's Answer (ECF 7) fails to state a ground specified in the Convention, lacks sufficient factual allegations or proof, or is even flatly contradicted by the proof before this Court.

**1.      The Composition of the Panel and the Arbitral Procedure Accorded With the Parties' Agreement (Answer at 7-8 ¶¶ 42-45)**

In apparent reliance on Article V(1)(d) of the Convention, Swanberg contends that "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties." Answer (ECF 7), at 7-8 ¶ 42. Specifically, Swanberg argues that the arbitration was inconsistent with Section 17.02 of the Shareholders Agreement that the parties had executed in 2013 in terms of the language of the proceeding, the applicable law, and the number of arbitrators. *See id.* at 8 ¶¶ 43-45.

This argument is not just wrong—it is frivolous. It ignores that the parties expressly agreed to arbitrate their dispute in accordance with the Arbitration Agreement of March 10, 2016. *See* Petition (ECF 1), at 8 ¶ 19; Arbitration Agreement (ECF 1-6). Swanberg's disregard of the Arbitration Agreement is inexcusable, especially given its admission that the parties had "referred their dispute to arbitration" under this document. Answer (ECF 7), 4-5 ¶ 19.

In the Arbitration Agreement, the parties expressly agreed to the Panel composition and

---

[2] By demonstrating the deficiencies in Swanberg's Answer, GHHL does not assume the burden to disprove any of the grounds specified in the Convention, which are always Swanberg's burden to prove.

procedures that Swanberg now complains of. In particular, the parties agreed that:

- for the "Language of Arbitration," "the Arabic language shall be the official language of the arbitration procedures, pleading and adjudication" (Arbitration Agreement (ECF 1-6), at 4);

- for the "Applicable Law," the Panel would "apply the provisions of the Saudi Arbitration Law . . . , the executive regulations thereof and the laws in force in the Kingdom, provided that the Panel shall duly observe the Islamic Sharia rules in this regard" (*id.* at 4);[3] and

- the three-member Panel, who were individually identified, would issue an award "unanimously or by the majority of votes" which would be "irrevocable, binding on the parties, resolving the dispute and enforceable" (*id.* at 5).

To the extent any part of the Arbitration Agreement differed from Section 17.02 of the Shareholders Agreement, the parties further agreed that the terms and conditions of the Arbitration Agreement would prevail insofar they "stipulate[d] otherwise[.]" *Id.* at 1. Thus, it is indisputable from the face of the Arbitration Agreement that both parties, including Swanberg, agreed to Arabic as the language of the proceeding, to the application of Saudi law, and that the arbitral authority would be comprised of three arbitrators.

Moreover, as recited in the Award (*see* ECF 1-8, at 2-12), Swanberg submitted multiple rounds of pleadings in the course of the arbitration. *See also* Answer (ECF 7), at 5 ¶ 20 (admitting same). The record does not reflect that Swanberg objected to the composition of the Panel or to the arbitration procedures before the Award was rendered. On the contrary, more than seven months into the arbitration, Swanberg confirmed through its Chief Executive Officer

---

[3] Swanberg appears to suggest that the Arbitration Agreement's reference to Sharia rules is inconsistent with Section 17.02 of the Shareholders Agreement. *See* Answer (ECF 7), ¶ 44. This is incorrect. Section 17.02 provides that matters "shall be referred to arbitration in accordance with the laws of the Kingdom of Saudi Arabia." *See* Shareholders Agreement (ECF 1-3), § 17.02. Saudi law, in turn, requires arbitrators to apply the decisional rules chosen by the parties "without prejudice to rules of Islamic Sharia." *See* Exh. 4, IBA, Arbitration Guide: Kingdom of Saudi Arabia (updated Jan. 2018) at 18; *see also* Exh. 6, KSA Royal Decree No. M/34 (Law of Arbitration, unofficial English translation), art. 38(1). Thus, the arbitration clause in Section 17.02 effectively incorporates Saudi law in this regard.

its consent to the arbitration then taking place under the Arbitration Agreement. *See* Exh. 1, Email from C. Newcomb (Swanberg) to GHHL, 10/24/2016 at 2 ("We believe that [the arbitration] is the appropriate course of action at this point in this long pending dispute.").

In light of all the above, it is indisputable that Swanberg agreed to the very aspects of the proceeding that it only now asserts were "not in accordance with the agreement of the parties." Answer (ECF 7) at 7 ¶ 42. Accordingly, this alleged defense fails.

## 2. Swanberg Cannot Argue that the Appointment of the Arbitrators Was Contrary to Saudi Law (Answer at 8 ¶ 46)

Swanberg next argues that the appointment of one or more arbitrators was "prohibited by the applicable laws of Saudi Arabia" because, allegedly, one or more of them "had an improper interest in the outcome of the proceeding, or were or had been employed by the principal of GHHL[.]" Answer (ECF 7), at 8 ¶ 46. This argument fails for a number of independent reasons.

To start, even if anything about the appointed arbitrators was "prohibited by applicable laws of Saudi Arabia," it would not provide grounds for refusing confirmation under the New York Convention. That is because the Convention "mandates very different regimes for the review of arbitral awards (1) in the countries in which, or under the laws of which, the award was made"—which are countries of primary jurisdiction—"and (2) in the other countries where recognition and enforcement are sought"—which are countries of secondary jurisdiction. *Gulf Petro Trading*, 512 F.3d at 746 (internal quotation marks and citation omitted). A primary jurisdiction court may "apply its full range of domestic law to set aside or modify an arbitral award[.]" *Id.* at 747. In contrast, "secondary jurisdiction courts may only refuse or stay enforcement of an award on the limited grounds specified" in the Convention. *Id.*

For purposes of this proceeding, this Court sits in a country of secondary jurisdiction. Therefore, it cannot refuse to confirm the Award based on an alleged violation of domestic Saudi

law, which is not one of the enumerated ground for refusing enforcement under the Convention. For this reason alone, Swanberg's Saudi law argument fails.

Moreover, Swanberg's argument ignores that it already attempted to set aside the Award in the courts of Saudi Arabia, and that the Saudi Court squarely rejected Swanberg's legal challenge under Saudi law. The Saudi Court's determination is *res judicata* and precludes Swanberg from running its failed argument again before this Court. *See Gulf Petro Trading Co., Inc. v. Nigerian Nat'l Petroleum Corp.*, 288 F. Supp. 2d 783, 794-95 (N.D. Tex. 2003) (holding that the primary court's determination regarding the enforceability of an award "must be recognized by [the U.S.] court as a matter of *res judicata* and international comity"), *aff'd*, 115 Fed. App'x 201 (5th Cir. 2004) (per curiam).

Apart from the manifest legal defects in Swanberg's argument, there are no factual allegations supporting it.[4] Nor has Swanberg submitted any proof. Thus, even if there were any legal merit in Swanberg's argument based on Saudi law (and there is not), Swanberg has discharged neither its burden of pleading nor its burden of proof on the matter.

### 3. Swanberg's Public Policy Argument Fails (Answer at 9 ¶¶ 47-48)

Swanberg argues that confirmation of the award "should be refused because it is contrary to the public policy of the United States." Answer (ECF 7), at 9 ¶ 47. The only allegations made in connection with this argument are the same as for Swanberg's Saudi law argument; namely, that "one or more of the arbitrators that rendered the award had an improper or prohibited interest in the outcome of the proceedings, or were or had been employed by GHHL." *Id.* ¶ 48.

Swanberg's "public policy" argument fails for a number of independent reasons. To

---

[4] GHHL objects to Swanberg's failure to plead specific factual allegations—which makes it difficult, if not impossible, to submit specific facts and evidence in rebuttal—and GHHL accordingly reserves all rights in this regard.

start, Swanberg ignores that "[t]he public policy defense is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." *Kahara Bodas*, 364 F.3d at 306 (internal quotation marks and citation omitted). This is an exceedingly high standard:

> Establishing a countervailing public policy that weighs against enforcement of an arbitral award is a substantial burden and requires the moving party to demonstrate a countervailing public policy sufficient to overcome the strong policy favoring confirmation. Such a public policy must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.

*BCB Holdings Limited v. Gov't of Belize*, 232 F. Supp. 3d 28, 49 (D.D.C. 2017) (internal quotation marks, citations and brackets omitted).

The public policy exception to confirmation is not met here. The only supposed public policy identified by Swanberg is that "arbitrators must be strictly impartial, unbiased with respect to the parties that appear before them, and disinterested in the outcome of the proceedings before them." Answer (ECF 7), at 9 ¶ 48. But Swanberg has not shown that this is a public policy of the United States. On the contrary, U.S. law and public policy leave parties "free to choose for themselves to what lengths they will go in quest of impartiality." *Sphere Drake Ins. Ltd. v. All Am. Life Ins*. Co., 307 F.3d 617, 620 (7th Cir. 2002). Indeed, when (as here) an arbitration is conducted before a three-member panel, the "party-appointed arbitrators . . . are expected to serve as *de facto* advocates." *Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin. Servs.*, 892 F.3d 501, 508 (2d Cir. 2018). Thus, Swanberg's sweeping allegation of what "public policy" demands is not just unsubstantiated; it is demonstrably incorrect.

In any event, even if Swanberg had persuasively identified a recognized public policy of the United States, it has not shown it to be sufficiently weighty "to overcome the strong policy favoring confirmation." *BCB Holdings*, 232 F. Supp. at 49. When it signed the Arbitration

Agreement referring the dispute to arbitration, Swanberg knew who the arbitrators would be. *See* Arbitration Agreement (ECF 1-6), at 5 (identifying arbitrators). Given Swanberg's express consent to arbitrate before the Panel, confirming the Award would clearly not violate the "most basic notions of morality and justice." *Kahara Bodas*, 364 F.3d at 306.

Independently of the above, and as already shown, Swanberg's argument that any arbitrator had an "improper" interest or was "employed by GHHL" lacks any supporting factual allegations or proof. Given these manifest failures of pleading and proof, Swanberg's "public policy" argument necessarily fails.

### 4. The Award Is Binding on the Parties and Has Not Been Set Aside or Suspended in Saudi Arabia (Answer at 9 ¶ 49)

Swanberg alleges that the Award "is on appeal and not final." Answer (ECF 7), at 9 ¶ 49. In actual fact, the Saudi Court definitively rejected Swanberg's appeal in the February 18, 2018 Judgment. It further commanded that the Saudi authorities "execute the present Award with all due legal means, [including] via the force of the police." Judgment (ECF 1-10), at 4.

For months after this Judgment was rendered, Swanberg took no action in relation to the Saudi Court's Judgment. Although Swanberg asserted on October 9, 2018 that compliance with the Award would be "premature" due to unspecified "legal proceedings in Saudi" (*see* Exh. 3 at 1), in actual fact, no such proceedings were pending at that time. Thus, on November 19, 2018, GHHL filed its Petition to Confirm in this Court (ECF 1). Swanberg was formally served with service of process on December 5, 2018 (ECF 5).

Undersigned counsel understands that shortly thereafter, on December 9, Swanberg filed a pleading in the courts of Saudi Arabia related to the Judgment. The timing of Swanberg's action is telling: It came more than nine months after the Saudi Court's February 18, 2018 Judgment upholding the Award, yet only four days after being served with GHHL's Petition to

Confirm in this Court. Swanberg apparently hopes that its twelfth-hour legal maneuver in Saudi Arabia will provide it with an argument for avoiding confirmation of the Award in this Court.

Swanberg's hope is misplaced. That is because Article V(1)(e) of the Convention, which Swanberg relies upon, precisely defines the conditions that must be proved before this Court may have discretion to refuse confirmation (emphasis added):

> (e) The award **has not yet become binding** on the parties, or **has been set aside or suspended** by a competent authority of the country in which, or under the law of which, that award was made.

Notwithstanding Swanberg's recent legal maneuver in the Saudi courts, Swanberg has made no showing that the Award is not yet "binding" on the parties. On the contrary, the Judgment of February 18, 2018 confirms that the Award *is* binding, as it orders enforcement "with all due legal means[.]" Judgment (ECF 1-10), at 4. And, needless to say, this Judgment did not "set aside or suspend[]" the Award. Accordingly, Swanberg's belated legal filing in Saudi Arabia provides no valid ground for refusing confirmation under Article V(1)(e) of the Convention.

**5.      Swanberg's "fraud" and "waiver" defenses, being entirely conclusory, fail (Answer ¶¶ 40-41)**

Without even minimal elaboration or proof, Swanberg alleges "fraud" and "waiver" as purported "affirmative defense[s]" to confirmation. Answer (ECF 7), at 7 ¶¶ 40-41. Fatally, Swanberg fails to relate these conclusory allegations to any of the specified grounds of Article V. In addition, these conclusory allegations are deficient on their face, lack any proof, and clearly do not provide a basis to refuse confirmation of the Award. *See also* FED. R. CIV. P. 9(b) (requiring that the party alleging fraud "must state with particularity the circumstances constituting fraud"). The Court must reject them.

**6.      Even If There Were Any Ground to Refuse Confirmation under the Convention (and There Is Not), the Award Should Still Be Confirmed**

The Convention embodies a "pro-enforcement bias." *Karaha Bodas*, 364 F.3d at 306

(internal quotation marks and citation omitted).  For this reason, the Convention provides that even if any ground in Article V were proved, it would only mean that enforcement "*may* be refused."  Convention, art. V(1) (emphasis added); *see also id.* art. V(2) (same).  "The permissive 'may' indicates that, notwithstanding the applicability of a defense against confirmation, courts retain the discretion to confirm the arbitral award." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 n.6 (11th Cir. 2004); *cf. BCB Holdings*, 232 F. Supp. 3d at 49 (holding that violation of another public policy "does not reach the threshold required to outweigh the policy in favor of enforcement" under the Convention).

Here, the pro-enforcement policy of the Convention fully supports confirmation of the Award, even if Swanberg had technically proved any ground set forth in Article V.  Swanberg commenced the arbitration on terms to which it expressly consented in the Arbitration Agreement.  The resulting Award resolved the parties' commercial dispute on just terms, effectively restoring the parties to their pre-contractual positions after their failed attempt to form a joint business venture.  Thus, the vast majority of the money that Swanberg has been ordered to pay would mean, in real terms, simply returning funds that it had originally received from GHHL for purposes of the parties' joint business venture.  At the same time, the Award confers a concomitant benefit on Swanberg, namely, the ability to repossess the equipment that it had provided to GHHL for purposes of the venture.

In addition, it bears recalling that the Saudi Court, having primary jurisdiction, has already heard and rejected Swanberg's appeal of the Award, deciding instead to order its enforcement.  The interests of international comity and consistency of judgments favor this Court doing the same here.  *Cf. Gulf Petro*, 288 F. Supp. 2d at 794-95.

In short, confirming the Award is just and would occasion no injustice to Swanberg.

Conversely, withholding confirmation would deprive GHHL of a long-awaited resolution to this dispute while rewarding Swanberg's blatant bad faith. Withholding confirmation would also undermine the pro-enforcement policy of the Convention, which is a treaty of the United States. Under these circumstances, the Court should confirm the Award, as it is authorized to do even if Swanberg had managed to prove any ground specified in the Convention for denying enforcement (though it has not).

### C.   Given that Swanberg's Unjustified Refusals to Abide by the Award Necessitated this Action, GHHL Intends to Seek Its Attorney's Fees After Judgment

As shown above, Swanberg's excuses for refusing to abide by the Award, which was rendered in accordance with an arbitral procedure it had expressly agreed to, are baseless. The motive for Swanberg's obstreperous post-award conduct is transparent: Swanberg simply prefers not to pay it. Of course, this is no justification to defy the Award.

Given that Swanberg has refused to abide by the Award without justification, the Court can and should exercise its inherent power to award the attorney's fees that GHHL has been forced to incur in this action. *See Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Texas Steel Co.*, 639 F.2d 279, 284 (5th Cir. 1981) (holding that a "district court abused its discretion in refusing to award attorneys' fees" when the challenger's "grounds for attacking an arbitration award [were] 'without justification'" (citation omitted)); *Concesionaria Dominicana de Autopistas y Carreteras, S.A. v. Dominican State*, 926 F. Supp. 2d 1, 3 (D.D.C. 2013) (collecting authorities recognizing court's inherent power to award attorney's fees under these circumstances).

Accordingly, GHHL reserves the right to seek its attorney's fees after this Court renders judgment. *See* FED. R. CIV. P. 54(d). In addition, if Swanberg fails to promptly satisfy the judgment, the Court should further order that GHHL recover attorney's fees incident to

enforcement and collection upon the judgment.

### D. The Judgment Should Be Stated in U.S. Dollars and Include Pre-Judgment and Post-Judgment Interest and Costs

GHHL takes this opportunity to clarify additional items about the judgment requested. First, the portion of the monetary relief of the Award that is stated in Saudi riyals (778,251) should be converted into U.S. dollars calculated as of the date of the Award. *See BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 251 (D.D.C. 2015). Of course, the remaining $5,330,000 should remain in U.S. currency.

Second, the judgment should include pre-judgment interest on all monetary relief calculated from the date of the Award to the date of the Court's judgment, as well as post-judgment interest on the judgment itself. *See Matter of Arbitration Between Trans Chem. Ltd. & China Nat. Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 312-13 (S.D. Tex. 1997).

Third, the judgment should include costs of this proceeding. *See* FED. R. CIV. P. 54(d).

## IV. REQUEST FOR RELIEF

GHHL respectfully requests entry of an order confirming the Award. Because this order will conclude this proceeding, GHHL additionally requests entry of a judgment thereon equivalent to the amounts Swanberg is ordered to pay in the Award, such amounts being stated in U.S. dollars and including pre-judgment and post-judgment interest and costs. GHHL reserves all rights, including to seek attorney's fees incurred up to the date of judgment and, if necessary, in the enforcement of the judgment. GHHL further requests all other just relief to which it is entitled.

Dated: January 17, 2019

Respectfully submitted,

/s/ C. Mark Baker
    C. Mark Baker
    State Bar No. 01566010
    S.D. Tex. Bar No. 993
    mark.baker@nortonrosefulbright.com
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

Attorney-in-Charge for Petitioner Gulf Haulage
Heavy Lift Co.

OF COUNSEL
NORTON ROSE FULBRIGHT US LLP
Denton Nichols
State Bar No. 24079056
S.D. Tex. Bar. No. 2078406
denton.nichols@nortonrosefulbright.com

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing motion was filed with the Court's electronic

case filing (ECF) system on the 17th day of January, 2019, which caused an electronic copy of

this document to be served on the following counsel of record who have appeared in this matter:

<table>
<tr>
<td>

**Christopher L. Ashby**
Texas Bar No. 07637550
S.D. Tex. Bar No. 18077
808 Travis Street, Suite 401
Houston, Texas 77002
Telephone: (713) 739-1100
Facsimile: (713) 739-1101
Email: kit.ashby@ashby-llp.com

</td>
<td>

**Brian E. Davis**
State Bar No. 00783933
S.D. Tex. Bar No. 15185
707 N. Walnut Avenue, Suite 201
New Braunfels, Texas 78130-7951
Telephone: (210) 568-7771
Facsimile: (2 10) 568-8198
E-mail: bdavis@cdrlegal.com

</td>
</tr>
</table>

*/s/ Denton Nichols*
Denton Nichols